UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOAN R. PEZZANI,                          )
                                          )
                                          )
          Plaintiff,                      )
                                          )
     v.                                   )          Case No. 4:17-CV-00988-SPM
                                          )
                                          )
UNITED STATES OF AMERICA,                 )
                                          )
          Defendant.                      )

## MEMORANDUM OPINION

This matter is before the Court following a bench trial conducted December 19, 2018

through December 21, 2018. Plaintiff Joan R. Pezzani filed this action against Defendant United

States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* After

consideration of the pleadings, the testimony, and the exhibits submitted by the parties, the Court

hereby makes and enters the following findings of fact and conclusions of law in accordance with

Rule 52(a) of the Federal Rules of Civil Procedure

I.     **FINDINGS OF FACT**

       **A. Background**

This case arises from an incident on July 24, 2015, in which Plaintiff Joan Pezzani was

injured while participating in a horseback riding trip at the United States Air Force Academy

Equestrian Center (the "Equestrian Center") in Colorado Springs, Colorado with several members

of her family. While attempting to mount her horse, Plaintiff placed her left foot into the stirrup of

her horse, tried to swing her right leg over, and was unable to do so; her right leg came down hard

on the ground, and her leg was injured. Plaintiff claims that the Equestrian Center employees were

negligent in failing to adequately assess her ability to safely mount the horse, in refusing Plaintiff's

requests to lower the stirrups, in not adequately instructing her on safely mounting the horse, and in not taking her to a mounting platform that would have allowed her to step onto the saddle instead of boosting herself up. Defendant's position is that the risks of mounting a horse are inherent risks of equine activity and thus, Defendant is immune from liability under Colorado Revised Statue § 13-21-119. In the alternative, Defendant argues that Plaintiff has not established Defendant was negligent under common-law principles. Defendant also argues that even if the Court finds Defendant was negligent, Plaintiff's own negligence was equal to or greater than Defendants' negligence, and that the Court should apply the comparative fault rules of Colorado and find that Plaintiff cannot recover.

## B.  The Incident on July 24, 2015

In July 2015, Plaintiff Joan Pezzani, her husband (Martin Pezzani), and her two children (L.P, 13 years old, and N.P., 11 years old) took a trip to Colorado Springs to visit Plaintiff's sister, Diana Heinz, and Diana's family. During the visit, the Pezzani and Heinz families decided to go horseback riding at the Equestrian Center. Diana and her husband Tony had been to the Equestrian Center in the past with their children and had positive experiences. Based on their past experiences with the Equestrian Center, Tony and Diana knew the ride would be unguided, meaning there is not much oversight during the ride, and the riders navigated the horses themselves. However, it is not clear whether the Pezzanis knew, in advance, what it meant that the ride would be "unguided." There were concerns raised about the Pezzanis' 11-year-old daughter, N.P., going on the ride because she has hypoplastic left heart syndrome, is a "Make a Wish" child, and is never let out of sight of her mother. However, Tony calmed those concerns because of information he gave the Pezzanis, and the Pezzanis decided they wanted to go.

When the group arrived at the Equestrian Center, Tony checked the entire group in. Although Tony typically had answered questions about the experience level of the riders in the

group, he could not recall whether he gave an assessment of each person's riding experience on the day in question. Tony did recall discussing N.P.'s needs and the ages of the children in the group. Once the group was checked in, Equestrian Center employee, Cody Wells, was available to help the riders mount their respective horses. According to Wells, it was a busy day at the Center. Both Plaintiff and her husband, Martin, credibly testified that Wells appeared to be in a bit of a rush when he assisted their group.

The horses were brought out one at a time, and there was a lead rope from N.P.'s horse so that someone could control N.P.'s horse while on the trail. The members of the Heinz family were first to mount their horses, and they did so without incident. Plaintiff helped her two children mount their horses. Plaintiff's husband, Martin, also safely mounted his horse, but only after asking Wells to lower the stirrups. At trial, Martin testified that when he went to mount his horse, he noticed that the stirrups were "too short to the saddle, too high off the ground." (Tr. Vol. 1 at 134-35). He did not believe he could safely mount and relayed that to Wells. Wells explained to Martin that the stirrups had been set high for children riding the day before. Martin asked Wells to lower the stirrups. Wells was initially not responsive to this request but eventually lowered the stirrups after Martin asked him to do so multiple times. By the time Martin mounted his horse, the Heinz family and the two Pezzani children were on their horses and already heading out of the paddock area where the mounting was occurring. In order to keep up with his daughters, Martin started to follow the others. Plaintiff had not yet mounted at that time.

Prior to the visit to the Equestrian Center on July 24, 2015, Plaintiff had ridden a horse about eight times, on guided trails. She did not consider herself an experienced rider, but she was comfortable with horses and was generally comfortable being around them. Plaintiff also felt comfortable mounting horses on her own and had never before failed to mount a horse. Although Wells was present when Plaintiff attempted to mount the horse, Wells did not ask her any specific

questions about whether she knew how to mount the horse safely, whether she knew where to put her left foot, or any other questions about the specifics of how to mount a horse. Instead, Wells asked only, "Can you do this?" and Plaintiff said yes. (*Id.* at 18). He then said, "Lady, you good?" and Plaintiff said yes. (*Id.*).

After this exchange, Plaintiff turned to look at the saddle and realized it looked like the stirrups were too high up for her to safely mount. Based on her in-court testimony and demonstration, Plaintiff seemed to think the bottom of the stirrup was near the middle of the horse's belly. Although photographic evidence presented at trial suggests the stirrup was not as high up as Plaintiff perceived it to be, Plaintiff nevertheless believed the stirrup was up too high and asked Wells to lower the stirrup.

Wells did not respond to Plaintiff's initial request to lower the stirrup; and, when she asked him the second time, he "kind of laughed" and said, "You got long legs, you can get up there." (*Id.* at 18-19, 138-39). Wells, who appeared to be in a hurry, did not offer Plaintiff a mounting block, a platform, or a leg up. At this point, Plaintiff was anxious because she could see that her daughters and husband were riding away, and she had expected that she would be guiding N.P.'s horse while her husband, Martin, assisted their other child during the ride. So, despite her misgivings about the height of the stirrup, Plaintiff tried, unsuccessfully, to mount the horse.

In attempting to mount the horse, Plaintiff put her left foot in the stirrup while her right foot was on the ground. She had no problem putting her foot in the stirrup. She grabbed the saddle horn with her left hand and, contrary to proper mounting technique, placed her right hand on the seat of the saddle. Although Wells was standing next to Plaintiff at the time, he did not say anything to her about the manner in which she was attempting to mount the horse. Plaintiff pushed herself up on her left leg and tried to bring her right leg up and over, but it would not go over. Neither the saddle nor the horse moved, and she did not slip during the attempt to mount. However, Plaintiff

was unable to get her right leg up and over the saddle. When Plaintiff was unable to get her right leg up and over the saddle, it came back down with a "tremendous amount" of force and twisted a little bit; she heard four very large pops when her foot hit the ground (*Id.* at 27-28, 40).

### C. Standard of Care Evidence

At trial, the parties offered competing expert opinion testimony regarding the applicable standard of care applicable to trail riding centers like the Equestrian Center.

#### 1. *Plaintiff's Expert, Randi Thompson*

Plaintiff's expert, Randi Thompson, is a Certified Horsemanship Association ("CHA") certified master instructor and clinician who, at the time of trial, had been working in the equine industry for 40 years and had been teaching and certifying instructors and trail guides for 25 of those years.[1] Relying on her professional experience and CHA manuals such as the "Riding Instructor and Trail Guide Manual" and the "Certified Horsemanship Association Standards for Equestrian Programs," Thompson testified that, to ensure rider safety, equestrian programs like the Equestrian Center should have a written procedure and practice for the mounting and dismounting for all riders for trail rides that includes a pre-ride briefing in which the experience level of each rider is assessed, instruction to the rider for proper mounting/dismounting procedures, and observation by employees during the mounting process to ensure the use of proper/safe mounting procedures.

Relying in part on the Western Saddle Guide's section on "How to Mount a Horse," Thompson testified that the safest way for an inexperienced rider to mount is to grab the saddle horn and the cantle or rear of the saddle for balance. A rider who places her hand on the seat of the

---

[1] The CHA is an industry group that has been certifying and training riding instructors and trail guides for over 50 years; the CHA came about because there was a need to provide instructors and guides with processes to keep people safe around horses.

saddle is not safely mounting, and a wrangler who observes this should stop the person.

Thompson opined that in this case, the Equestrian Center failed to make a reasonable and prudent effort, through a CHA-type step-by-step process, to determine Plaintiff's ability to safely mount the horse. Thompson testified that the Equestrian Center employee should have asked Plaintiff whether she could comfortably mount the horse from the ground, should have asked whether she could put her foot in the stirrup comfortably, should have asked her whether she knew where to put her hands (at least as soon as he saw where she put them), and should have made a determination of whether Plaintiff knew how to spring up. Thompson further opined that the wrangler "didn't evaluate and he didn't determine [Plaintiff's] level or her abilities including taking her up to the horse. He should have known as soon as she put her hand in the wrong place, and he should have corrected it." (Tr. Vol. 1 at 205). Thompson opined that, based on where Plaintiff stated she placed her hands before attempting to mount, it would be "almost impossible" for a rider to mount a horse. (*Id.* at 198-99).

Specifically, Thompson pointed out that "[a] rider balances when they are getting up in a saddle, they hold both sides and it keeps them balanced, and it makes it easier for them when mounting from the ground to be able to lift their body up there." (*Id.* at 198). Thompson testified that the Equestrian Center employee standing behind Plaintiff should have seen that Plaintiff did not know where to put her right hand and should have slowed her down and said, "Ma'am, your hand needs to be up here to balance your body. And at that point he may have needed to physically put her hand where it should have been where she could safely mount." (*Id.* at 205-206). She testified, "It was obvious that for Plaintiff to put her hand in the wrong place tells you how much experience she really did not have." (*Id.* at 207-208). In Thompson's opinion, if the wrangler was not observing Plaintiff as she tried to mount, he fell below the standard of care:

Q.      So, it's possible that [the employee] may have looked away for a second,

she puts her hand on the horn, puts a foot in the thing and jumps up, and he didn't even see it? . . .

A.    That's impossible. If he's standing next to her, he is the guide. He's the wrangler. He's in charge of her safety. That's his job. If he's not watching, shame on him.

(*Id.* at 247-48).

Thompson also testified that when Plaintiff asked the employee two times to lower the stirrup, he should have lowered the stirrup or taken her to a mounting platform, even if he thought the stirrup was low enough. Thompson further testified that Plaintiff's requests to lower the stirrup should have been a "red flag" to the employee to stop her from mounting and offer a safe way for her to mount. (*Id.* at 261-63). She testified that a wrangler "should know that when a customer requests that they lower the stirrup that there's something going on . . . There's a problem to be addressed." (*Id.* at 237-38). In Thompson's opinion, it was the Equestrian Center's employee's responsibility, as an alternative, to offer Plaintiff a mounting block or a "leg up." (*Id.* at 243). Thompson testified that even if Plaintiff was in a hurry to get out on the trail to supervise her daughter, the wrangler "should have slowed her down and told her how to do it correctly. He was there to keep her safe." (*Id.* at 253-54).

Thompson disagreed that the safety procedures outlined above did not apply to the ride at issue because it was an unguided ride. She testified that simply because the ride itself was unguided, it did not mean that it would have been a proper and safe practice for the Equestrian Center simply to leave the group on its own during mounting. She also testified that at the beginning of the ride at the Equestrian Center, "[t]he process in the beginning is the same as if they were going on a guided trail ride. The wranglers bring the horses out, they mount the people, they tell them the basics of stop, start, and steer." (*Id.* at 218).

Thompson testified that the failure of the wrangler to either lower the stirrup or take Plaintiff to the mounting block was a violation of the standard of care for a trail ride operation. She also testified that the wrangler's failure to make a reasonable and prudent attempt to determine the ability of Plaintiff to safely mount the horse was a violation of the proper standard of care for a trail ride operation.

Thompson acknowledged there is an inherent risk of horseback riding that injury can occur due to the actions of a rider during the mounting process. However, Thompson opined that decisions regarding stirrup length for mounting and whether to use a mounting block are not inherent risks of equine activities, because they are decided on by a staff member. Thompson also opined that where, as in this case, a guide is present with an inexperienced rider mounting a horse, injury from an unsuccessful attempt to mount is not an inherent risk of horseback riding because the rider is being assisted. Thompson opined that inherent risks of equine activities do not include the actions or decisions of the trail operation staff.

### 2. *The Equestrian Center's Practices Described by Cody Wells*

Equestrian Center wrangler, Cody Wells, testified at trial (via videotaped testimony) regarding the typical habits and practices he followed while working at the Equestrian Center. Consistent with Thompson's opinions regarding the applicable standard of care, Wells testified that when someone came to the Equestrian Center, he would (i) assess the person's riding experience by asking "if they had ever been out before, if they had ever ridden any horses before, what kind of horse experience they have, or anything like that;" (ii) give instructions and "make sure they knew how to get on the horse, how to steer and stop the horse," and tell them how the trail is laid out; (iii) ensure the stirrup length is "comfortable" and "correct" for the rider and adjust the stirrups if requested or offer a mounting block if necessary; and (iv) instruct the rider on where to place her hands when the rider is preparing to mount the horse. (Videotaped Deposition of Cody

Wells, March 1, 2018 ("C.W. Dep.") 10-11, 16-17, 24, 38). Wells also testified that if he saw a customer trying to get on a horse and put their hand on the seat of the saddle instead of the cantle, he would point it out and tell the person to put their right hand on the cantle or show them how he would do it. He believes that placing the hand on the saddle or face of the saddle is "not appropriate, but some people just do it so fast you can't stop . . . them."    (C.W. Dep. 26).

Wells could not testify whether he did or did not adhere to any of the foregoing practices on July 24, 2015, because he had no recollection of the Pezzani and Heinz families and no recollection of the incident on July 24th.

### 3. Defendant's Expert, Wayne Hipsley

Defendant's expert, Wayne Hipsley, opined that the CHA standards relied on by Plaintiff's expert did not apply to the Equestrian Center. Hipsley has a bachelor's degree in agricultural animal husbandry and a master's degree in animal physiology. Hipsley's qualifications include experience providing consulting and educational programs to horse organizations training horse show judges and exhibitors; serving as a licensed horse show judge for over 40 years; and serving as a consulting equestrian expert in legal matters in the United States and internationally. Hipsley agreed that "protocols need to be in place for equestrian riding operations such as the Equestrian Center;" however, he opined that pre-ride protocols are different for unguided and guided rides. (Tr. Vol. 2, at. 58). Specifically, Hipsley testified that when someone signs up for an unguided ride, there is an inference "that you basically are assuming the risk of everything from the time you mount the horse or you're presented the horse until you return the horse to the stable." (*Id.* at 21). He also testified that in an unguided ride, "the presumption is that the riders have come and they have experience in riding, controlling, and guiding a horse." (*Id.* at 26). Hipsley contrasted an unguided ride with a guided program where, in his opinion, there are more specifics given as to how to control a horse, turn, and stop; it is designed for people who are not familiar with how to

ride or how to control a horse. Hipsley acknowledged he did not see anything in the Equestrian Center Handbook or in any of the materials he was provided stating to riders at the Equine Center that they were on their own while mounting a horse.

Hipsley acknowledged that the CHA's Riding Instructor and Trail Guide says to show riders how they will mount and dismount, but he testified that he did "not agree that that standard applies to an unguided ride unless someone has asked for assistance." (*Id.* at 61). He acknowledged that Plaintiff did ask for assistance by asking for her stirrups to be lowered two times. However, he disagreed that the Equestrian Center employee should have taken Plaintiff to a mounting platform before she attempted to mount; he testified, "No, because it's my understanding that there was communication where she said she was comfortable mounting from the ground. And she had ridden previously. . . . [S]o there as an indication that that was not necessary." (*Id.* at 41).

Hipsley testified that there is no proper scientific measurement for stirrup length; "It's all speculation on the reach of the left foot and leg. The athleticism of the person is really what it gets down to." (*Id.* at 45). According to Hipsley, the fact that someone asks for her stirrups to be adjusted does not necessarily tell the wrangler anything about the rider's physical ability to mount the horse; nor does it necessarily mean that the wrangler should just lower the stirrups. Instead, opined Hipsley, the judgment of the wrangler is preferred over that of the inexperienced rider.

After looking at a photograph of N.P.'s horse, Hipsley testified that it appeared that stirrups of the same length as were on N.P.'s horse would have been adequate in length for Plaintiff to mount a similarly-sized horse. Because the wrangler asked Plaintiff to try to mount, Hipsley's assumption is that he had estimated the stirrup to be in the proper length. Hipsley opined that the fact that Plaintiff put her left foot in the stirrup indicated that she was "ready or prepared to take the next step to climb on the horse." (*Id.* at 51-52). However, he agreed that it did not mean the mount would be successful or without injury.

10

Consistent with the testimony of Wells and Thompson, Hipsley testified that when mounting, the rider should put the left hand on the saddle horn or somewhere in that area, and "the right hand needs to be placed on the cantle of the saddle so that you're pulling or presenting equal pressure, pull pressure to lift yourself up . . ." (*Id.* at 42). He also opined that while more experienced riders like rodeo riders or cowboys can safely mount a horse by placing their right hand on the seat rather than the cantle, when "we deal with lesser experienced riders, the bottom line is we want a left hand on the horn, a right hand on the cantle to help them pull up to keep them stable as they go through that process." (*Id.* at 54).

Hipsley opined that the mounting process can be dangerous, for example if the horse walks off or the saddle slips. He testified that the risks associated with the mounting process are inherent risks of horseback riding. Hipsley also testified that the risks associated with the wrangler's decisions regarding the height of the stirrup and whether to lower it are inherent risks of equine activities.

Hipsley opined that the Equestrian Center staff acted appropriately and with the reasonable degree of care in getting the party of nine people mounted in this case, and they made every effort to assist with the mounting of the riders. He opined that the Equestrian Center employees adequately determined whether Plaintiff could participate in the activity safely and "conducted their process of making a determination to their standards for an unguided ride." (*Id.* at 55).

### D. Damages Evidence

After her family returned from the ride, Plaintiff was taken to urgent care, where she reported "hurt right knee when stepped off horse. Fell and heard multiple pops in right knee." (Ex. 1). She was given an immobilizer and crutches and referred to an orthopedist. The Pezzani family returned to St. Louis the next day, and Martin testified that Plaintiff was in pain on the entire drive from Colorado to St. Louis.

After she returned to St. Louis, Plaintiff went to see Dr. Robert Brophy, a board-certified orthopedic surgeon.[2] (Deposition of Robert Brophy ("R.B. Dep.")   At her first visit, on July 30, 2015, Dr. Brophy aspirated 45 ccs of fluid from Plaintiff's knee, prescribed a brace, and ordered an MRI. The MRI showed a right anterior cruciate ligament (ACL) tear, a lateral meniscus tear, an osteochondral fracture of the posterior medial tibial plateau, a contusion of the posterior lateral femoral condoyle, and potential deep vein thrombosis (DVT, or blood clot). Dr. Brophy opined that these injuries were caused by Plaintiff falling and twisting the knee as described in his records.

Venous doppler tests confirmed the existence of blood clots in Plaintiff's lower right leg. Dr. Brophy opined that the clots formed either from the initial impact on the vein or from difficulty with weight-bearing after the actual trauma. To treat the blood clots, Plaintiff had to undergo a series of anti-coagulation injections and take oral Xarelto for months. She and her husband administered the injections two times per day, for 25 days, in her abdomen. As a side effect of her blood thinning regimen, Plaintiff had very heavy menstrual bleeding. By March 2016, there was no sign of DVT.

Plaintiff's leg remained in the first leg brace for about eight months. During this time, Plaintiff attempted physical therapy in an effort to avoid surgery. However, surgery was deemed necessary, and on April 6, 2016, Dr. Brophy performed surgery to repair the meniscus tear and reconstructed the ACL with a graft. He removed pieces of Plaintiff's hamstring tendons, drilled into the femur and tibia, and attached the grafts with screws in each bone, and "tied it over a post." (R.B. Dep. 29-31). He also inserted a pain pump. Dr. Brophy opined that the surgery and treatments provided were necessitated by the injury on July 24, 2015.

---

[2] The transcript of Dr. Brophy's deposition testimony does not appear to be part of the record; thus, the Court relies on the statements of fact and citations to Dr. Brophy's deposition that are contained in the parties' post-trial briefs, as well as the Court's own notes and recollections from viewing Dr. Brophy's videotaped deposition at trial.

Following surgery, Plaintiff again was put in a brace. She suffered post-operative swelling in her knee, and she still had pain and swelling about a month after surgery. So, the doctor drained her knee and ordered an anti-inflammatory medication. At a visit in July 2016, Dr. Brophy noted continued laxity in the right knee and recommended she wear a brace when mowing the lawn or engaging in similar activities. Plaintiff returned to Dr. Brophy on August 30, 2018, because she had aching pain and numbness, which Dr. Brophy noted are common after this kind of injury and surgery.

Prior to her injury in this case, Plaintiff had one incident in which she was diagnosed with knee pain from a "hyperextended" knee; she characterized this as a pulled muscle, and she testified that her primary care provider did not order physical therapy, prescribe pain medication (aside from a topical ointment), or send her to an orthopedist. Although a medical record from May 2016 referenced "arthritis" in Plaintiff's knee, Dr. Brophy testified that there was no evidence that Plaintiff had arthritis before he saw her, and Plaintiff testified that she had never been told she had arthritis.

Plaintiff testified that she was not allowed to drive for two months after the accident, could not shower for over nine months, and could not do stairs. She also could not care for her daughter N.P. as she had done previously, and she missed out on participating in her older daughter's activities. Plaintiff's husband testified that Plaintiff has recovered about 70% of her daily activities but she still has trouble walking on uneven surfaces; she still has lessened mobility; she cannot carry heavy weights; and she has to take her time going up and down stairs. Plaintiff still does not mow the lawn, and she has swelling and loss of sensation in her leg.

Dr. Brophy was not aware of any limitations in Plaintiff's activities of daily living. He testified that Plaintiff should have minimal future pain. Dr. Brophy opined that Plaintiff is at a "much higher risk" for developing arthritis in the knee, due to her injuries and surgery. (R.B. Dep.

10-12, 47-48). However, he testified that there is no indication, to a reasonable degree of medical certainty that Plaintiff will require future surgery on her right knee. She may not need any future care at all.

Plaintiff submitted a form, prepared without the assistance of counsel, to Defendant, making a claim for $304,128.06. (Ex. 17). This included medical expenses, as well as $274,792.00 in pain and suffering, inconvenience, emotional distress, loss of companionship, and loss of general enjoyment of life. Plaintiff has presented evidence that her medical bills are $47,282: $270 from urgent care, $10,730 from Washington University for Dr. Brophy, $32,395 from Barnes Jewish Health, and $3,887 for prescriptions and injections. (Exhs. 2, 4, 5, 15).

## II.    CONCLUSIONS OF LAW

Plaintiff brings this action under the FTCA, 28 U.S.C. §§ 2671, *et seq.*, alleging negligence on the part of the Equestrian Center and its employees. This Court has subject matter jurisdiction over this FTCA action pursuant to 28 U.S.C. § 1346(b)(1). Venue is proper in this district because Plaintiff resides in this district. *See* 28 U.S.C. § 1402(b).

The FTCA permits lawsuits against the United States for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Courts decide FTCA claims under the law of the state where the tort occurred. *Glorvigen v. Cirrus Design Corp.*, 581 F.3d 737, 743 (8th Cir. 2009). As the parties agree, the substantive law of Colorado applies to this case, because Colorado is "the law of the place where the act or omission occurred." *See* 28 U.S.C. § 1346(b)(1).[3]

_____

[3] The parties do have a dispute over whether, under Colorado choice of law rules, the comparative

Defendant argues that it is immune from liability for Plaintiff's claims pursuant to Colorado Revised Statute § 13-21-119 (the "Equine Statute"), which bars liability for injuries caused by certain equine-related activities. In the alternative, Defendant argues that if the Equine Statute does not bar liability, Plaintiff has failed to establish the elements of common-law negligence.

The Court recognizes that if the Equine Statute applies to exempt Defendant from liability in this case, the Court need not reach the question of whether Plaintiff has established the elements of common-law negligence. However, as the discussion of the Equine Statute below will make clear, the Court's analysis of whether the Equine Statute's exemption from liability applies (and whether any of its exceptions apply) requires some analysis of whether the wrangler acted negligently or acted in a reasonable and prudent manner. Thus, to avoid duplication, the Court will first address whether Plaintiff has established the elements of a negligence claim and will then address whether the Equine Statute applies.

## A. Common-law Negligence

The Court first considers the question of whether Plaintiff has established the elements of common-law negligence, assuming that the Equine Statute does not apply. Under Colorado law, a negligence claim has four elements: "a duty owed by the defendant to the plaintiff, a breach of that duty, injury to the plaintiff, and a proximate cause relationship between the breach and the injury." *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo.1992).

Defendant does not appear to dispute that *if* the Equine Statute does not apply here, Defendant owed Plaintiff duty, under common law principles, to act with reasonable care. See Def.'s Trial Br., Doc. 38, at 8-9. "In determining whether a duty should be recognized, a court must consider many factors, 'including, for example, the risk involved, the foreseeability and

---

fault law of Colorado applies or the comparative fault law of Missouri applies. As discussed *infra*, the Court need not decide this question, because the outcome is the same under either state's law.

likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor.'" *Id.* (internal quotation marks omitted). "[T]he question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Id.* (internal quotation marks omitted).

Both Plaintiff's expert and Defendant's expert acknowledged that the process of mounting a horse is a potentially dangerous activity that involves significant risks of harm. It is clear that the risk that a rider will lose her balance and fall during the mounting process is a foreseeable risk. Plaintiff's expert testified that safely mounting a horse is a major concern of the industry, because it is a very challenging time, and she specifically discussed industry manuals recommending the use of mounting blocks to help riders mount without losing their balance and hand positions during mounting that should be used to help with balance. Moreover, the evidence shows that the Equestrian Center employees did provide its clients with assistance in the mounting process and did not inform them that they were responsible for knowing how to mount horses on their own. The Court finds that under these circumstances, reasonable persons would agree that the Equestrian Center owed Plaintiff a duty to act with reasonable care in assisting her with the mounting process, in light of the foreseeable risks associated with that process.

The Court next considers the standard of care that applies and whether that standard of care was breached in this case. "Legal duty is defined in terms of a standard of care." *United Blood Servs., a Div. of Blood Sys., Inc. v. Quintana*, 827 P.2d 509, 519 (Colo. 1992). "The standard of care that must be met in order to satisfy a recognized duty and thereby avoid breach is that of reasonable care in light of the apparent risk." *Casebolt*, 829 P.2d at 35. "[A] legal duty to use reasonable care arises in response to a foreseeable and unreasonable risk of harm to others."

*Quintana*, 827 P.2d at 519. "[I]n ordinary negligence cases, an actor is required to conform his or her conduct to a standard of objective behavior measured by what a reasonable person of ordinary prudence would or would not do under the same or similar circumstances." *Id.* "For those practicing a profession involving specialized knowledge or skill, reasonable care requires the actor to possess a standard minimum of special knowledge and ability and to exercise reasonable care in a manner consistent with the knowledge and ability possessed by members of the profession in good standing." *Id.* (internal citations and quotation marks omitted). "Because in most cases of professional negligence the applicable standard is not within the common knowledge and experience of ordinary persons, the applicable standard must be established by expert testimony." *Id.*

Both Plaintiff's expert and Defendant's expert offered testimony regarding the standard of care that applies here and whether that standard was breached in this case. With regard to these questions, the Court gives great weight to the testimony of Plaintiff's expert, Randi Thompson. Thompson has extensive education and experience directly related to trail riding operations and associated safety issues, including experience in training riders and wranglers in safe mounting practices. In addition, her opinions were well-supported by several industry manuals describing appropriate practices. Based on Thompson's testimony, the Court finds that a wrangler who was assisting a rider in mounting, if he was acting with reasonable care, would make a reasonable effort to determine whether the rider knew the basics of how to mount (such as where to place the left foot, where to place the hands, and how to spring up and swing the right leg over); would provide instruction in mounting if needed; would make a reasonable effort to determine that the rider was comfortable mounting; and would watch the rider during the mounting process to make sure she was using safe practices during mounting (such as placing her hands in the right place). The Court also finds, based on Thompson's testimony, that a rider's requests that the wrangler lower the

stirrups would have alerted a wrangler acting with reasonable care that there was a problem with the rider's ability to safely mount, such that he should have stopped her from mounting and addressed the problem, either by lowering the stirrup as requested or by offering her a leg up or mounting block.

The Court also notes that Thompson's testimony about the reasonable standard of care is generally consistent with Wells' own testimony about how he usually approaches the mounting process. Wells testified that in his normal course of practice at the Equestrian Center, he would make sure a customer knew how to get on the horse, would make sure that the stirrup length was correct for the customer, would instruct the customer on where to place her hands and how to move her legs during mounting, and would ask her if was comfortable with that. He also testified that he would not let a rider get on if the stirrup was too high, that if a rider said she was not comfortable with the length of a stirrup, he would lower it, and if the rider still was not comfortable, then he would offer the mounting block. He also testified that if he actually saw a customer trying to get on a horse and put their hand on the seat of the saddle instead of the cantle, he would point it out and tell the person to put their right hand on the cantle or show them how he would do it.

Thompson testified that Wells' conduct in assisting Plaintiff with the mounting process on the date in question violated the reasonable standard of care for a safe trail riding operation. The Court agrees. Although Wells asked Plaintiff very general questions such as, "Can you do this?" and "Lady, you good?", there is no evidence that he asked her about her prior experience riding and mounting, that he made any effort to determine whether she knew the basics of how to mount, that he provided any instruction to her in how to mount safely, or that he watched her to make sure she placed her hands in the right place when she tried to mount. Even after Plaintiff alerted him to a concern about her ability to mount the horse under the circumstances before her by asking twice for him to lower the stirrups, he did not take any additional steps to help her safely mount, such as

lowering the stirrup, taking her to a mounting block, or offering her a leg up. Instead, when she requested that he lower the stirrups, he "kind of laughed," and said something like, "You got long legs, you can get up there." Moreover, even though he knew she had misgivings about her ability to mount, he either did not watch her closely enough to observe that she was putting her right hand in an unsafe location, or did observe her improper hand placement but failed to correct it. His actions violated the reasonable standard of care.

The Court gives little weight to the testimony of Defendant's expert, Hipsley, that the wrangler acted appropriately and within the reasonable degree of care in this case. Although Hipsley has extensive experience in the horse industry, he has significantly less experience with trail riding operations and with training riders and wranglers in safe mounting practices than does Plaintiff's expert. Moreover, Hipsley did not cite any industry manuals or other documentary evidence in support of his opinions. Much of Hipsley's opinion is based on his opinion that there are different standards for "unguided rides" and "guided rides." He opined that in an unguided ride, the wrangler does not have to be involved with assisting in the mounting process, "because the presumption is that [the rider] ha[s] had experience in riding and, therefore, [the rider] would know how to mount a horse and control the horse during that process" and the rider is "assuming the risk of everything from the time . . . [the rider is] presented the horse until [the rider] return[s] the horse to the stable." However, it is not at all clear where this presumption comes from. Although the Equestrian Center describes an "unguided ride," the undisputed evidence from Wells and others shows that the wranglers at the Equestrian Center did not presume that its clients were experienced riders or that they knew how to mount a horse; instead, the usual practice was for Equestrian Center employees to ask riders about their experience level and to closely supervise the mounting process. Additionally, there is no evidence that the Equestrian Center only offers its services to riders who have experience riding and know how to mount a horse, nor is there any

19

evidence to suggest that Equestrian Center riders were informed or otherwise given the impression that there was an assumption that they were responsible for knowing how to mount a horse on their own.

The Court next turns to the question of whether the wrangler's violation of the standard of care caused Plaintiff's injuries. The Court acknowledges the evidence showing that mounting a horse is physically challenging and that even if Wells had acted consistently with the standard of care, there is no guarantee that Plaintiff would have mounted successfully and avoided injury. However, the Court finds it more likely than not that if Wells had taken the reasonable steps identified by Thompson, Plaintiff would have avoided her fall and injury in this case.

The evidence presented at trial demonstrated that Plaintiff's failure to safely mount the horse more likely than not resulted from a combination of Wells' failure to lower the stirrups when Plaintiff asked him to do so (or take Plaintiff to a mounting block) and the improper placement of Plaintiff's hands during the mounting process. Although there was conflicting evidence regarding whether the stirrup was *actually* too high for Plaintiff to mount safely, the fact that Plaintiff *perceived* that the stirrup was set too high is not in dispute. Plaintiff credibly testified that she believed the stirrup was set too high for her to safely mount the horse and she asked Wells to lower the stirrup. In an effort to rebut this testimony, the defense offered Wells' testimony that he would typically lower stirrups if a rider asked him to do so presumably as evidence that either Plaintiff did not make the request or Wells complied with her request. However, the Court cannot treat Wells' testimony of what he would *typically* do as evidence of that actually occurred on July 24th, for two reasons. First, Wells testified he had no specific recollection of the events on July 24th. Second, the evidence presented at trial that Wells was distracted and in a hurry and that Wells himself acknowledged it was a busy time based on the sign-in logs suggest that Plaintiff's injury occurred during an *atypical* time at the Equestrian Center.

As set out above, both Wells and Thompson testified that the proper course of action for a wrangler to follow when a rider requests that stirrups be lowered is to either lower the stirrups (to make sure the rider was comfortable during the attempted mount) or to offer a mounting block or a leg up. That course of action was not followed in this case, and the evidence presented demonstrates that Plaintiff's injury would more likely than not have been avoided had Wells adhered to the applicable standard of care.

The Court further finds that if the wrangler had asked Plaintiff whether she knew where to put her hands, instructed her in where to put her hands, and/or observed her hand placement and corrected it, it is more likely than not that Plaintiff would have avoided her fall. Plaintiff testified at trial that she placed her right hand on the seat of the saddle rather than the back or cantle, in contravention of the appropriate practice as described by both experts at trial, Wells, and the CHA manual. The experts testified that the proper hand placement provides balance and stability, and Plaintiff's expert opined that Plaintiff's hand placement would have made it almost impossible for her to mount the horse.

For all of the above reasons, the Court finds that the Equestrian Center's violation of the reasonable standard of care caused Plaintiff's injuries.

### B.  Plaintiff's Own Negligence and Comparative Fault

Having found that Plaintiff established that the Equestrian Center staff was negligent and that his negligence caused her injury, the Court next considers Defendant's argument that Plaintiff's negligence also contributed to her injury, such that the Court must apply comparative fault rules to reduce Plaintiff's recovery or to bar it entirely.

The parties dispute whether the applicable comparative fault law is that of Colorado or that of Missouri.[4] Under Colorado's comparative fault law, "the court shall reduce the amount of the verdict in proportion to the amount of negligence attributable to the person whose injury, damage, or death recovery is made; but, if the said proportion is equal to or greater than the negligence of the person against whom recovery is sought, then, in such event, the court shall enter a judgment for the defendant." C.R.S. § 13-21-111(3). Thus, under Colorado law, if Plaintiff's negligence was greater than Defendant's negligence, Plaintiff cannot recover at all. In contrast, "Missouri allows a negligent plaintiff to recover proportionate damages even though his fault may have been greater than that of the party from whom he seeks damages *Gerling Am. Ins. Co. v. Cont'l Cement Co., LLC*, No. 207CV00018MLM, 2009 WL 3247441, at *6 (E.D. Mo. Oct. 5, 2009) (citing *Hicks v. Graves Truck Lines, Inc*., 707 S.W.2d 439, 442 (Mo. Ct. App. 1986)). "Under the pure comparative fault principles adopted by Missouri in *Gustafson v. Benda*, 661 S.W.2d 11 (Mo. banc. 1983), the injured party's own negligence is compared to that of the negligence of defendant to determine whether any damages awarded should be diminished in proportion to the amount of negligence attributable to that plaintiff."  *Lipp v. Ginger C, L.L.C*., 229 F. Supp. 3d 1018, 1020 (W.D. Mo. 2017) (citing *Cornell v. Texaco, Inc.*, 712 S.W.2d 680, 682 (Mo. banc. 1986)).

In the instant case, the Court need not decide whether to apply Colorado's comparative fault law or Missouri's comparative fault law, because the outcome is the same under either state's law. As discussed below, the Court finds that Defendant's negligence was greater than Plaintiff's negligence. Thus, comparative fault does not bar recovery completely under either state's law.[5]

---

[4] Defendant raised this issue, among other issues, in its Motion in Limine (Doc. 41). At the final pretrial conference held on December 13, 2018 the Court ruled on the record on several of the issues raised in Plaintiff's Motion in Limine. (Doc. 50, Doc. 51). However, the Court took this issue under submission.

[5] Because the outcome is the same under either Missouri or Colorado comparative negligence law, the Court will deny as moot that aspect of Defendant's motion in limine.

Instead, the Court must, under either state's law, merely reduce Plaintiff's recovery in proportion to the amount of negligence attributable to Plaintiff.

After review of the evidence, the Court finds that Plaintiff's own negligence did contribute in part to her injuries. As discussed above, the Equestrian Center employee negligently failed to instruct, assist, and monitor Plaintiff during the mounting process. However, Plaintiff herself is not without fault. Plaintiff had mounted horses before, and Plaintiff recognized that she might not be able to mount the horse safely with the stirrup positioned where it was. Despite this, Plaintiff attempted to mount the horse anyway, without insisting either that the stirrup be lowered, that she be taken to a mounting platform, or that she be given a leg up. Plaintiff bears some responsibility for that decision. However, the unreasonableness of Plaintiff's decision to attempt to mount despite her misgivings is mitigated by two factors: the fact that Plaintiff's two requests for assistance were ignored or refused, and the fact that Plaintiff believed she had to get on the horse so that she could catch up with the rest of the group and help monitor her daughter, who had health issues and whom Plaintiff was always responsible for. There is conflicting testimony regarding where the other horses were when Plaintiff was attempting to mount, with Plaintiff recalling that they were already going out on the trail and others recalling that they were nearby or were just leaving the paddock area where the mounting was occurring. The Court finds credible the evidence from Plaintiff and her husband that the other horses were at least starting to move away from the mounting area, such that Plaintiff had the reasonable impression that the group (including her daughters) was either leaving or was likely to soon leave. Particularly in light of her daughter's health problems, it was not unreasonable for her to be concerned about catching up with the rest of the group so that she could help her husband monitor their daughters.

In light of the above evidence, the Court concludes that Plaintiff's injuries are 75% attributable to the negligence of Defendant, and 25% attributable to Plaintiff's own negligence.

Because the Court finds that Plaintiff's negligence was 25% responsible for her injuries, the Court will reduce her damages award accordingly.

## C. The Equine Statute

Even if Defendant would be liable under common-law negligence principles, it is not liable if it is exempt from liability under the Equine Statute. The Equine Statute provides an exemption from civil liability, subject to certain exceptions, for injuries resulting from "inherent risks" of equine activities. Defendant bears the burden of proving that the acts causing injury were inherent risks covered by the statute. *Clyncke v. Waneka*, 157 P.3d 1072, 1075 (Col. 2007). Courts are to "apply strict construction to th[e] grant of limited immunity." *Id.* at 1076.

Subsection 3 of the Equine Statue states, in relevant part:

Except as provided in subsection (4) of this section, an equine activity sponsor, an equine professional, . . . or any other person, which shall include a corporation or partnership, shall not be liable for an injury to or the death of a participant resulting from the inherent risks of equine activities. . . and, except as provided in subsection (4) of this section, no participant nor participant's representative shall make any claim against, maintain an action against, or recover from an equine activity sponsor, an equine professional,. . . or any other person for injury, loss, damage, or death of the participant resulting from any of the inherent risks of equine activities . . .

C.R.S. § 13-21-119(3).

"Inherent risks of equine activities" is defined in the Equine Statute as follows:

those dangers or conditions which are an integral part of equine activities . . . , as the case may be, including, but not limited to:

(I) The propensity of the animal to behave in ways that may result in injury, harm, or death to persons on or around them;

(II) The unpredictability of the animal's reaction to such things as sounds, sudden movement, and unfamiliar objects, persons, or other animals;

(III) Certain hazards such as surface and subsurface conditions;

(IV) Collisions with other animals or objects;

(V) The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as failing to maintain control over the animal or not acting within his or her ability.

*Id.* (2)(f).

Section (4) lists several exceptions to the immunity provided in Section (3), stating in relevant part:

(b)     Nothing in subsection (3) of this section shall prevent or limit the liability of an equine activity sponsor, an equine professional, a llama activity sponsor, a llama professional, or any other person if the equine activity sponsor, equine professional, llama activity sponsor, llama professional, or person:

     (I)     (A) Provided the equipment or tack, and knew or should have known that the equipment or tack was faulty, and such equipment or tack was faulty to the extent that it did cause the injury; or

           (B) **Provided the animal and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity or llama activity and determine the ability of the participant to safely manage the particular animal based on the participant's representations of his ability**;

     (II)     Owns, leases, rents, or otherwise is in lawful possession and control of the land or facilities upon which the participant sustained injuries because of a dangerous latent condition which was known to the equine activity sponsor, equine professional, llama activity sponsor, llama professional, or person and for which warning signs have not been conspicuously posted;

     (III)     Commits an act or omission that constitutes willful or wanton disregard for the safety of the participant, and that act or omission caused the injury;

     (IV)     Intentionally injures the participant.

*Id.* (4)(b) (emphasis added).

Defendant argues that Plaintiff's accident resulted from an inherent risk of equine activities and that none of the relevant exceptions apply to her injuries. Plaintiff disputes both points, arguing (1) that Plaintiff's injuries did not result from inherent risks of equine activities, but instead resulted from wrangler negligence, and (2) that exception (4)(b)(I)(B) applies, because the Equestrian

Center staff "[p]rovided the animal and failed to make reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity" or failed to "determine the ability of the participant to safely manage the particular animal based on the participant's representations of his ability."[6]

The Court first considers the question of whether Plaintiff's injury resulted from an inherent risk of equine activity, as that term is used in the Equine Statute. Defendant first argues that Plaintiff's injury is covered by the listed inherent risk describing "[t]he potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, such as . . . not acting within his or her ability." Defendant argues that even though Plaintiff believed she could not mount the horse with the stirrups at the length they were, she attempted to mount the horse anyway, and in her haste, she put her right hand on the wrong part of the saddle and failed to get the proper pull to kick her right leg over. The Court finds this argument persuasive only in part. To the extent that this provision of the statute immunizes Defendant from liability, it can do so only to the extent that Plaintiff's injury was caused by her own negligence. As discussed above, although the Court finds that Plaintiff's own negligence contributed in part to her injury, the Court finds that the negligence of the wrangler was also a cause of her injury (and indeed, was a cause greater than Plaintiff's negligence). To the extent that Plaintiff's injury was caused by Equestrian Center employee negligence rather than Plaintiff's negligence, this provision provides no immunity.

Defendant also argues that the although the risks associated with mounting and stirrup

---

6  The Colorado Supreme Court has held that the exception described in § 13-21-119(4)(b)(I)(B) applies, and defendants may be held liable, "if they *either* failed to make reasonable efforts to determine the participant's ability to engage in the activity or failed to make reasonable efforts to determine the participant's ability to manage an animal." *Clyncke*, 157 P.d at 1074.

length determinations are not specifically enumerated as inherent risks in the statute, they are nonetheless "dangers or conditions which are an integral part of equine activities," and thus should be considered inherent risks. To support this position, they rely on the testimony of Hipsley, who testified that that the risks associated with the mounting process are inherent risks of horseback riding and that the risks associated with the wrangler's decisions regarding the height of the stirrup and whether to lower are not inherent risks of equine activities.

Plaintiff, on the other hand, argues that there is a distinction between injuries caused by "inherent risks of equine activities" and those caused by wrangler negligence, and that Plaintiff's injuries were caused by wrangler negligence. To support this argument, Plaintiff relies on the testimony of her own expert, Thompson, who testified that although the inherent risks of equine activities would include risks of injury associated with a rider mounting on her own, they do not include risks of injury associated with the actions or decisions of the trail operation staff while assisting a rider in the mounting process. Thompson also testified that the stirrup length for mounting is not an inherent risk of equine activities, because it is decided on by a staff member.

Plaintiff also relies on *Fielder v. Academy Riding Stables*, 49 P.3d 349 (Colo. Ct. App. 2002), in which the Colorado Court of Appeals found that an injury whose direct cause was wrangler negligence was not an inherent risk of equine activities within the meaning of the Equine Statute. In *Fielder*, an eleven-year-old girl went on a guided horseback ride. *Id.* at 350. Her parents completed a form indicating that she had no experience riding horses, and the defendant's employees properly matched her to an appropriate horse. *Id.* About one-third of the way through the two-hour ride, the girl began to scream. *Id.* The screaming spooked her horse, and the horse bolted forward into the plaintiff's horse. *Id.* The plaintiff's horse reared, throwing the plaintiff to the ground and injuring him. *Id.* The trial court found that Plaintiff's injuries were a direct result of the "inherent risks of equine activities," within the meaning of C.R.S. 13-21-119(2)(f) (stating

that the inherent risks of equine activities include, *inter alia*, "[t]he unpredictability of the animal's reaction to . . . sounds," "[c]ollisions with other animals," and "[t]he potential of a participant to act in a negligent manner that may contribute to injury to the participant or others . . .."). However, the trial court also found that an exception applied that permitted the plaintiff to recover. *Id.* [7] The Colorado Court of Appeals reversed the trial court's inherent risk finding, holding that the accident had not been caused by inherent risks of equine activity but instead had been caused by wrangler negligence. *Id.* at 351-52. The court stated:

> [T]he immunity granted in the statute is limited to injuries resulting from the inherent risks of equine activities. *See B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 138 (Colo. 1998) (noting that liability under the Act is not limited if injury to the participant results from "non-inherent" or other risks). Here, the accident was not directly caused by such an inherent risk. Instead, the direct cause was the negligence of the wranglers in failing to remove the child from the horse before it bolted.

*Id.* at 351. The Court further stated,

> There is no provision granting immunity for the negligence of defendant's wranglers in failing to protect the participants from an obvious danger of which they have ample notice.
>
> Accordingly, . . . we read "inherent risks of equine activity" as a limitation on the types of activity for which immunity is granted. We conclude that the negligence of the wranglers here is not among such "inherent risks." We further conclude that this interpretation represents a strict construction of the grant of immunity, as is required.

Id. at 352.

Although Plaintiff cited *Fielder* in her trial brief, Defendant does not attempt to distinguish it, nor does Defendant cite any other Colorado cases addressing the scope of the term "inherent

---

[7] The trial court found that although the plaintiff's injuries were the result of inherent risks of equine activities, Defendant was nonetheless liable under the exception that applies where an equine professional fails to make reasonable efforts to determine the ability of the participant to safely manage the particular animal based on the participant's representations of his or her ability. 49 P.3d at 351. On appeal, the court did not reach the question of whether the exception applied, because it found that the injury was not a result of an inherent risk. *Id.*

risk" as that term is used in the Equine Statute.[8]

The Court finds *Fielder* instructive in this case. *Fielder* establishes that even where the cause of an injury may, on its face, appear to fall within the express definition of "inherent risks," the statute does not bar liability where the direct cause of the injury was the wrangler's negligence. As discussed at length above, the Court finds that Plaintiff's injury was caused by wrangler negligence. Therefore, the Equine Statute does not apply to immunize Defendant from liability.

In the alternative, assuming, *arguendo*, that Plaintiff's injury *was* caused by an inherent risk of equine activities within the meaning of the Equine Statute, the Court finds that one of the exceptions to the Equine Statute's exemption from liability applies here. As discussed above, the Equine Statute does not bar liability where the defendant "provided the animal and failed to make

---

[8] The only case Defendant cites to support its inherent risk argument is *Kovnat v. Xanterra Parks & Resorts*, 770 F.3d 949 (10th Cir. 2014), a Tenth Circuit interpreting the term "inherent risk" as used in a Wyoming statute. *Kovnat* provides no support for Defendant's position. Defendant cites only the portions of *Kovnat* in which the Tenth Circuit described the *district court's* reasoning in finding that a wrangler's failure to adjust uneven stirrups was an inherent risk of horseback riding and granting summary judgment to the defendant. *See* Def.'s Post-Trial Br., Doc. 68, at 59 (citing *Kovnat*, 770 F.3d at 953). However, the Tenth Circuit reversed the district court's finding on appeal, stating that although the task of ensuring that a rider's stirrups are even is "a matter of human judgment that is not performed with scientific precision,"

> [A] jury could reasonably find that the wrangler who overheard and commented on Kovnat's concerns about her stirrups was not in a position to see both of Kovnat's stirrups and otherwise made no attempt to ensure that the stirrups were even, or was aware of the unevenness of Kovnat's stirrups but made a choice not to adjust them.

> We conclude that, under either of these factual scenarios, Kovnat would have been exposed to an atypical risk, rather than a risk inherent in the sport of horseback riding. In turn, Xanterra would not be immune from liability under the WRSA.

*Id.* at 960. (quotation marks omitted). *Kovnat* is thus consistent with Plaintiff's position that injuries caused by wrangler failures may not be injuries resulting from "inherent risks" of equine activities.

reasonable and prudent efforts to determine the ability of the participant to engage safely in the equine activity . . ." § 13-21-119(3). *See also Clyncke*, 157 P.3d at 1075.[9] Plaintiff argues that the wrangler in this case failed to make reasonable and prudent efforts to determine the ability of Plaintiff to safely mount the horse. For many of the same reasons articulated in the negligence section above, the Court agrees.

Again, the Court gives great weight to the testimony of Plaintiff's expert, Thompson, who testified that the wrangler failed to make a reasonable and prudent attempt to determine the ability of Plaintiff to safely mount the horse. Based on Thompson's testimony, which is supported by her extensive experience and industry manuals, the Court finds that a reasonable and prudent effort to ensure a rider's ability to mount a horse at a trail riding operation would have involved asking the rider questions about her prior experience riding and mounting, finding out whether she knew how to mount and was comfortable mounting, finding out whether she could put her foot in the stirrup comfortably, finding out whether she knew how to put her hands in the right place, and watching her place her hands to see whether she was putting them in a safe location for mounting. The Court also finds, based on Thompson's testimony, that Plaintiff's request that Wells lower the stirrups would have alerted a reasonable and prudent wrangler that there was a problem with Plaintiff's ability to safely mount, such that he should have stopped her from mounting and addressed the problem, either through lowering the stirrup or offering a leg up or mounting block.

As discussed above, the evidence regarding Plaintiff's experience on date in question shows that the wrangler at the Equestrian Center did not follow the above procedures, or anything substantially similar. The Court concludes that he did not make reasonable and prudent efforts to determine Plaintiff's ability to safely engage in the activity of mounting the horse.

---

[9] There is no evidence to support the application of any of the other statutory exceptions.

The Court gives little weight to the testimony of Defendant's expert, Hipsley, who opined that the Equestrian Center adequately determined whether Plaintiff could participate in the activity safely, made every effort to assist with the mounting of the riders, and "conducted their process of making a determination to their standards for an unguided ride." (Tr. Vol. 2, at 55). As the Court noted in assessing Hipsley's opinion regarding negligence, Hipsley's opinion rests on his unsupported opinion that because this was an unguided ride, the wranglers had very limited responsibilities when they were assisting riders in mounting. The Court also gives little weight to Hipsley's testimony that it was not necessary for Wells to take steps such as offering a mounting platform, because it was his "understanding that there was communication where she said she was comfortable mounting from the ground." (Tr. Vol. 2, at. 40-41). This testimony does not adequately account for the fact that although Plaintiff did initially indicate that she was capable of mounting, she subsequently asked twice for assistance (in the form of requests that the stirrup be lowered), indicating that she was not actually comfortable mounting under the circumstances before her.

For all of the above reasons, the Court finds that Plaintiff's injury was not caused by an inherent risk of equine activities, and that even if it was, an exception to the exemption from liability for inherent risks applies because the wrangler did not make a reasonable and prudent effort to determine Plaintiff's ability to engage in the activity of mounting the horse. Thus, the Equine Statute does not bar a finding of liability in this case.

### D.  Damages

Finally, the Court considers the question of damages. Plaintiff seeks damages in the amount of $304,128.06. She states that this represents medical bills totaling $47,282, as well as other damages for noneconomic losses, including pain and suffering, emotional distress, inconvenience, and loss of general enjoyment of life, as reflected in a form she submitted to Defendant following

her injury. Plaintiff also suggests that she should recover damages because her injury places her at a higher risk of developing arthritis in her right knee and possibly requiring surgery on that knee.

Defendant does not object generally to Plaintiff's contention that if she is successful on her negligence claims, she may recover for past and future economic losses (including medical expenses) and past and future noneconomic losses (including physical and mental pain and suffering, inconvenience, emotional distress, and impairment of the quality of life). *See* Colo. Jury Instr., Civil 6:1 (jury instruction on damages for adult personal injury cases under Colorado law).[10] However, Defendant does argue that there is no credible evidence of any current limitations to Plaintiff's activities of daily living as a result of the injury. Defendant also argues that Plaintiff should not be awarded damages based on the increased risk that she will require surgery on her right knee, because there is no indication to a reasonable degree of medical certainty that Plaintiff will require future surgery to her right knee.

The Court finds that Plaintiff is entitled to recover for the full amount of her medical bills. Under Colorado law, Plaintiff "may recover damages for medical treatment that is reasonable and necessary." *Banning v. Prester*, 317 P.3d 1284, 1289 (Colo. App. 2012) (citing *Lawson v. Safeway, Inc.* 878 P.2d 127, 130-31 (Colo. App. 1994)). Plaintiff has submitted evidence of $47,282 in medical bills, and Defendant does not argue that the medical treatment Plaintiff was received was not reasonable and necessary. The Court finds that these bills were for medical treatment that is reasonable and necessary and will award Plaintiff $47,282 in economic losses for those bills.

The Court next turns to Plaintiff's claim for damages related to her noneconomic losses, including pain and suffering and loss of enjoyment of life. The Court finds that Plaintiff has

---

[10] Defendant points out that this case does not involve lost wages and does not involve a loss of consortium claim, and Defendant points out that punitive damages are not recoverable under the FTCA. Plaintiff does not appear to be seeking any such damages.

established that she suffered significant pain, suffering, and loss of enjoyment of life related to the pain from the initial injury and the follow-up treatment that she required. Plaintiff's injury required her to be in a leg brace for several months, to give undergo twice-daily injections for almost a month, to go on blood-thinning medications that caused heavy bleeding, and to undergo surgery on her knee. Plaintiff has also shown that she was unable to drive for two months after the accident, could not shower for several months, was not able to care for her daughter as she normally did for several months, and missed her daughters' activities for several months. She has also shown that even after surgery, she has experienced swelling and pain and has undergone at least one post-surgery draining procedure for swelling and inflammation.

It is less clear what pain, suffering, loss of enjoyment of life, and medical expenses Plaintiff will suffer in the future from her injuries. Although Dr. Brophy testified that he was not aware of any limitations in Plaintiff's activities of daily living, the Court finds partially credible Plaintiff's and Plaintiff's husband's testimony that Plaintiff continues (and will likely continue for some time) to have some loss of functioning related to her injury, including having trouble walking, especially on uneven surfaces; having lessened mobility; and having to take her time going up and down stairs. has to take her time going up and down stairs; and has lost sensation in her knee. The Court finds that she is entitled to some damages related to this ongoing and future pain and suffering and loss of enjoyment of life.

The Court agrees with Defendant, however, that Plaintiff has not shown that she is entitled to damages related to the increased risk that she will develop arthritis and need knee surgery in the future, she is not entitled to such damages. Dr. Brophy could not say that there is a reasonable degree of medical certainty that Plaintiff will require future surgery on her right knee, and he testified that she may not need any future care for her knee at all. "[A] damage award may not be based on speculation or conjecture." *Palmer v. Diaz*, 214 P.3d 546, 552 (Colo. App. 2009).

Plaintiff's suggestion that she may be at a higher-than-normal risk of developing arthritis and needing knee surgery in the future is too speculative to support an award of damages.

The Court next must make a determination as to the appropriate amount of damages. "An amount of damages need not be determined via a mathematical formula; it may be an approximation if the fact of damages is certain and there is some evidence from which the [trier of fact] can make a reasonable estimation. *Margenau v. Bowlin*, 12 P.3d 1214, 1218 (Colo. Ct. App. 2000). The Court finds the amount of Plaintiff's damages caused by the injury to be as follows: $47,282 for medical bills, plus $200,000 for past and future pain, suffering, and loss of enjoyment of life, for a total of $247,282. As discussed above, this award must be reduced by 25% to reflect the extent to which Plaintiff's own injuries were caused by her own negligence. Thus, Defendant will be required to pay Plaintiff a total of $185,461.50

### III. CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that judgment is entered in favor of Plaintiff Joan Pezzani, and against Defendant United States of American, in the amount of $185,461.50 A separate judgment shall accompany these findings of fact and conclusions of law.

**IT IS FURTHER ORDERED** that with respect to the question of whether the comparative fault law of Missouri or Colorado applies, Defendant's Motion in Limine (Doc. 41) is **DENIED** as moot.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of September, 2019.